1 | Shawn A. McMillan, Esq. – SBN: 208529
attyshawn@netscape.net
2 | Stephen D. Daner, Esq. – SBN: 259689
steve.mcmillanlaw@gmail.com
3 | THE LAW OFFICES OF SHAWN A. MCMILLAN, APC
4955 Via Lapiz
4 | San Diego, California 92122
Telephone: (858) 646-0069
5 | Facsimile: (858) 746-5283

6 | Tiffany T. Chung (SBN 275981)
Tiffany@chunglegal.com
7 | Law Offices of Tiffany Chung
800 W. 6th Street, # 800
8 | Los Angeles, CA 90017
Tel: 310-363-0327
9 | Fax: 888-402-2078

10 | Attorneys for Plaintiffs

11 | **UNITED STATES DISTRICT COURT**

12 | **NORTHERN DISTRICT OF CALIFORNIA**

13 |

| | |
|---|---|
| V.P., a minor, by and through her guardian ad litem, CARLOTA GARCIA-PACHUCA; ANTONIO PANTOJA-COBIAN, an individual; CARLOTA GARCIA-PACHUCA, an individual, | Case No.: |
| | **COMPLAINT FOR DAMAGES** |
| Plaintiffs, | (1) 42 U.S.C. §1983 (Unwarranted Seizure of Child) |
| vs. | (2) 42 U.S.C. §1983 (Unwarranted Medical Examinations, Assessments, and/or Procedures |
| COUNTY OF ALAMEDA, a public entity; Myesha Walker-Lillard, an individual; Roxana Jimenez, an individual; Nicole Phillips, an individual; Lolita Nun, an individual; Dawn Abram, an individual; Marilyn Warrick, an individual; Khyla Hopson, an individual; Shaterra Grant, an individual; Seng Fong, an individual; Angelina Ramos, an individual; Siddiq Mora, an individual; Tasha Knighten, an individual; Melissa Fegurgur, an individual; Mia Buckner-Preston, an individual; DOES 1 through 20, inclusive, | (3) 42 USC §1983 (Deception in The Creation of and/or Presentation of Evidence/False Reporting) |
| | (4) 42 U.S.C. 1983 (Failure to Provide Dependent Minor Continued Safety and Security and Even Minimally-Adequate Care and Supervision) |
| | (5) 42 U.S.C. § 1983 (Violation of Rights Under Federal Statute) |
| | (6) Breach of Mandatory Statutory Duties |
| Defendants. | (7) Negligence |
| | **JURY TRIAL DEMANDED** |

**Jurisdiction and Venue**

1. This Court has original Federal Question Jurisdiction pursuant to 28 U.S.C. §§1331 and 1343, over Plaintiffs' claims for Violation of Civil Rights 42 U.S.C. §1983.

2. The acts and omissions alleged in this Complaint occurred in the County of Alameda, and it is believed that all living parties and public/private entity parties currently reside in or are largely situated in the County of Alameda.

3. Venue is proper in the United States District Court for the Northern District of California because a substantial part of the acts or omission complained of herein occurred primarily in the County of Alameda, and it is believed that many living parties named herein currently reside in, maintain offices in, and/or are responsible for enforcing the laws relevant to this litigation in the County of Alameda.

4. This action is brought, at least in part, pursuant to 42 U.S.C. §1983 to seek redress for Defendants' actions and or omissions taken under color of law which violated Plaintiffs' rights arising under the 1st, 4th, and 14th Amendments to the United States Constitution. In addition, this action is brought to seek redress for Defendants' acts and/or omissions which resulted in their failure to adhere to the mandatory statutory duties they owed to the Plaintiffs under both federal and state law.

**TOLLING AND COMPLIANCE WITH TORT CLAIMS STATUTE**

5. From February 2, 2024, to the present, Plaintiff V.P. had an ongoing juvenile dependency case with Children and Family Services in Alameda County where she had been determined to be dependent minor. As such, all applicable statutes of limitations that might have applied to V.P.'s claims against Alameda County and the individual County Defendants were tolled by operation of law. Government Code § 911.6 (b)(2).

6. In addition to the above, all applicable statutes of limitations, if any, on claims by V.P. were tolled because, at all relevant times, V.P. was, is, and remains a

dependent of the Juvenile Court and the entity having custody and control of V.P. was the entity to which the claim must have been presented and Alameda County failed to make a report as required by law (Government Code § 911.4 (c)(2) et seq.).

7. Thus, the Notice of Tort Claim served on the County on V.P.'s behalf on December 5, 2024 was timely in that it was served within six months of the liability generating events and she is still within the custody and control of the Defendants.

8. In addition, County Defendants *did not* reject the claims. Instead, the County sent a letter acknowledging receipt of the Claims Notice, and informed the Plaintiffs that "Please be advised we are investigating the circumstances surrounding the claim. The claim review process can take 45 days or more. You will be advised in writing of the County of Alameda's decision after our investigation."

9. Regardless, as pertinent to this Complaint, California Code of Civil Procedure Section 340.1 states that:

(a) In an action for recovery of damages suffered as a result of childhood sexual assault, the time for commencement of the action shall be within 22 years of the date the plaintiff attains the age of majority or within five years of the date the plaintiff discovers or reasonably should have discovered that psychological injury or illness occurring after the age of majority was caused by the sexual assault, whichever period expires later, for any of the following actions:

(1) An action against any person for committing an act of childhood sexual assault.

(2) An action for liability against any person or entity who owed a duty of care to the plaintiff, if a wrongful or negligent act by that person or entity was a legal cause of the childhood sexual assault that resulted in the injury to the plaintiff....

1
2
3
4
5
6
7
8
9

(c)    An action described in paragraph (2) or (3) of subdivision (a) shall not be commenced on or after the plaintiff's 40th birthday unless the person or entity knew or had reason to know, or was otherwise on notice, of any misconduct that creates a risk of childhood sexual assault by an employee, volunteer, representative, or agent, or the person or entity failed to take reasonable steps or to implement reasonable safeguards to avoid acts of childhood sexual assault. For purposes of this subdivision, providing or requiring counseling is not sufficient, in and of itself, to constitute a reasonable step or reasonable safeguard. . . .

10
11
12
13
14
15
16
17
18
19
20
21
22
23

(d)    "Childhood sexual assault" as used in this section includes any act committed against the plaintiff that occurred when the plaintiff was under the age of 18 years and that would have been proscribed by Section 266j of the Penal Code; Section 285 of the Penal Code; paragraph (1) or (2) of subdivision (b), or of subdivision (c), of Section 286 of the Penal Code; subdivision (a) or (b) of Section 288 of the Penal Code; paragraph (1) or (2) of subdivision (b), or of subdivision (c), of Section 287 or of former Section 288a of the Penal Code; subdivision (h), (i), or (j) of Section 289 of the Penal Code; any sexual conduct as defined in paragraph (1) of subdivision (d) of Section 311.4 of the Penal Code; Section 647.6 of the Penal Code; or any prior laws of this state of similar effect at the time the act was committed. This subdivision does not limit the availability of causes of action permitted under subdivision (a), including causes of action against persons or entities other than the alleged perpetrator of the abuse. . . .

24
25
26
27
28

(q)    Notwithstanding any other provision of law, any claim for damages described in paragraphs (1) through (3), inclusive, of subdivision (a) that has not been litigated to finality and that would otherwise be barred as of January 1, 2020, because the applicable statute of limitations, claim presentation deadline, or any other time limit had expired, is revived, and

1    these claims may be commenced within three years of January 1, 2020. A
2    plaintiff shall have the later of the three-year time period under this
3    subdivision or the time period under subdivision (a) as amended by the act
4    that added this subdivision.

5  10.  Pursuant to Government Code §905(m), any claims made pursuant to Section
6    340.1 of the Code of Civil Procedure, which includes all of the claims made herein
7    arising under state law, for the recovery of damages suffered as a result of
8    childhood sexual assault are excepted from the government notice of tort claim
9    filing requirements.

10  11.  Plaintiffs make the following allegations and claims upon personal belief,
11    investigation of her counsel, and on information and belief.

12  **The Plaintiffs**

13  12.  At all times relevant to this Complaint, the minor Plaintiff V.P., by and through
14    her guardian *ad litem*, CARLOTA GARCIA-PACHUCA was a resident of the
15    County of Alameda, California.

16  13.  At all times relevant to this Complaint, Plaintiff CARLOTA GARCIA-PACHUCA
17    was a resident of the County of Alameda, California, and was/is the biological
18    mother of Plaintiff V.P.

19  14.  At all times relevant to this Complaint, Plaintiff ANTONIO PANTOJA-COBIAN
20    was a resident of the County of Alameda, California, and was/is the biological
21    father of Plaintiff V.P.

22  **The County Defendants**

23  15.  Defendant County of Alameda ("County") is a public entity of which the Alameda
24    County Social Services/Children and Family Services ("CFS") is a subdivision.

25  16.  At all times relevant to this Complaint, CFS Social Worker Myesha
26    Walker-Lillard ("Ms. Walker-Lillard") was an individual residing in the County of
27    Alameda, and an officer, agent, and/or employee of the County of Alameda and
28    CFS. Based on information and belief Defendant Walker-Lillard was an

Emergency Response Worker. At all times Defendant Walker-Lillard was acting under color of law and within the course and scope of her duties as an employee of the County.  Moreover, at all relevant times Defendant Walker-Lillard's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

17.   At all times relevant to this Complaint, CFS Social Worker Roxana Jimenez ("Ms. Jimenez") was an individual residing in the County of Alameda, and an officer, agent, and/or employee of the County of Alameda and CFS.  Based on information and belief Defendant Jimenez was an case carrying social worker. At all times Defendant Jimenez was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Jimenez's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

18.   At all times relevant to this Complaint, CFS Social Worker Supervisor Nicole Phillips ("Ms. Phillips") was an individual residing in the County of Alameda, and an officer, agent, and/or employee of the County of Alameda and CFS. At all times Defendant Phillips was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Phillips's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

19.   At all times relevant to this Complaint, CFS Social Worker Supervisor Lolita Nun ("Ms. Nun") was an individual residing in the County of Alameda, and an officer, agent, and/or employee of the County of Alameda and CFS. At all times Defendant Nun was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Nun's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

20.   At all times relevant to this Complaint, CFS Social Worker Dawn Abram ("Ms.

1    Abram") was an individual residing in the County of Alameda, and an officer,

2    agent, and/or employee of the County of Alameda and CFS.  Based on information

3    and belief Defendant Abram was a placement social worker. At all times

4    Defendant Abram was acting under color of law and within the course and scope

5    of her duties as an employee of the County. Moreover, at all relevant times

6    Defendant Abram's conduct as alleged herein comported with the customs,

7    policies, procedures, and practices of the County.

8    21.    At all times relevant to this Complaint, CFS Social Worker Marilyn Warrick ("Ms.

9    Warrick") was an individual residing in the County of Alameda, and an officer,

10    agent, and/or employee of the County of Alameda and CFS.  Based on information

11    and belief Defendant Warrick was a placement social worker.  At all times

12    Defendant Warrick was acting under color of law and within the course and scope

13    of her duties as an employee of the County. Moreover, at all relevant times

14    Defendant Warrick's conduct as alleged herein comported with the customs,

15    policies, procedures, and practices of the County.

16    22.    At all times relevant to this Complaint, CFS Social Worker Khyla Hopson ("Ms.

17    Hopson") was an individual residing in the County of Alameda, and an officer,

18    agent, and/or employee of the County of Alameda and CFS.  Based on information

19    and belief Defendant Hopson was a placement social worker. At all times

20    Defendant Hopson was acting under color of law and within the course and scope

21    of her duties as an employee of the County. Moreover, at all relevant times

22    Defendant Hopson's conduct as alleged herein comported with the customs,

23    policies, procedures, and practices of the County.

24    23.    At all times relevant to this Complaint, CFS Social Worker Shaterra Grant ("Ms.

25    Grant") was an individual residing in the County of Alameda, and an officer,

26    agent, and/or employee of the County of Alameda and CFS.  Based on information

27    and belief Defendant Grant was an ERFA placement social worker. At all times

28    Defendant Grant was acting under color of law and within the course and scope of

1  her duties as an employee of the County. Moreover, at all relevant times
2  Defendant Grant's conduct as alleged herein comported with the customs, policies,
3  procedures, and practices of the County.

4  24.  At all times relevant to this Complaint, CFS Social Worker Seng Fong ("Ms.
5  Fong") was an individual residing in the County of Alameda, and an officer, agent,
6  and/or employee of the County of Alameda and CFS.  Based on information and
7  belief Defendant Fong was an ER placement social worker. At all times Defendant
8  Fong was acting under color of law and within the course and scope of her duties
9  as an employee of the County. Moreover, at all relevant times Defendant Fong's
10 conduct as alleged herein comported with the customs, policies, procedures, and
11 practices of the County.

12 25.  At all times relevant to this Complaint, CFS Social Worker Angelina Ramos ("Ms.
13 Ramos") was an individual residing in the County of Alameda, and an officer,
14 agent, and/or employee of the County of Alameda and CFS.  Based on information
15 and belief Defendant Ramos was a family reunification social worker. At all times
16 Defendant Ramos was acting under color of law and within the course and scope
17 of her duties as an employee of the County. Moreover, at all relevant times
18 Defendant Ramos's conduct as alleged herein comported with the customs,
19 policies, procedures, and practices of the County.

20 26.  At all times relevant to this Complaint, CFS Social Worker Supervisor Siddiq
21 Mora ("Ms. Mora") was an individual residing in the County of Alameda, and an
22 officer, agent, and/or employee of the County of Alameda and CFS. At all times
23 Defendant Mora was acting under color of law and within the course and scope of
24 her duties as an employee of the County. Moreover, at all relevant times
25 Defendant Mora's conduct as alleged herein comported with the customs, policies,
26 procedures, and practices of the County.

27 27.  At all times relevant to this Complaint, CFS Social Worker Supervisor Tasha
28 Knighten ("Ms. Knighten") was an individual residing in the County of Alameda,

1
2
3
4
5
6

and an officer, agent, and/or employee of the County of Alameda and CFS. Based on information and belief Defendant Knighten was a placement social worker. At all times Defendant Knighten was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Knighten's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

7
8
9
10
11
12
13

28.    At all times relevant to this Complaint, CFS Program Manager Melissa Fegurgur ("Ms. Fegurgur") was an individual residing in the County of Alameda, and an officer, agent, and/or employee of the County of Alameda and CFS. At all times Defendant Fegurgur was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Fegurgur's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

14
15
16
17
18
19
20

29.    At all times relevant to this Complaint, CFS Division Director Mia Buckner-Preston ("Ms. Buckner-Preston") was an individual residing in the County of Alameda, and an officer, agent, and/or employee of the County of Alameda and CFS. At all times Defendant Buckner-Preston was acting under color of law and within the course and scope of her duties as an employee of the County. Moreover, at all relevant times Defendant Buckner-Preston's conduct as alleged herein comported with the customs, policies, procedures, and practices of the County.

21
22
23

30.    Hereinafter, when referred to collectively, the Defendants in paragraphs 9-29 inclusive, may occasionally be referred to as the SOCIAL WORKER DEFENDANTS or Social Worker Defendants.

24
25
26
27
28

31.    Plaintiffs are ignorant of the true names and capacities of those County of Alameda Defendants sued herein as County of Alameda Defendant DOES 1 through 20, and for that reason has sued such County of Alameda Defendants under such fictitious names. Plaintiffs will seek leave of Court to amend this Complaint to identify the DOE Defendants when their identities have been

ascertained. Each of the fictitiously named County of Alameda DOE Defendants was in some manner liable and legally responsible for the harms sustained by Plaintiffs in that their conduct caused the damages and injuries set forth herein.

32.  Whenever this Complaint makes reference to any act of Defendants, such allegations shall be deemed to mean all named Defendants, or their officers, agents, managers, representatives, employees, heirs, assignees, customers, tenants, who did or authorized such acts while actively engaged in the operation, management, direction or control of the affairs of Defendants (or any of them) and while acting within the course and scope of their duties, except as specifically alleged to the contrary.

33.  At all times relevant to this Complaint, Defendants were the knowing agents and/or alter egos of one another. Defendants directed, ratified, and/or approved each other's conduct and that of each other's agents or employees. Defendants agreed upon, approved or ratified each other's conduct, or otherwise conspired together to commit all of the acts and/or omissions alleged herein.

## COMMON ALLEGATIONS

– ***V.P. is a Troubled Child; Her Parents, Carlota and Antonio, Do Their Best to Control Her; She Sneaks Out at Night And Gets Caught by Police in a Stolen Car; Police Release Her Into County Custody***

34.  In December 2023 and January 2024, Carlota and Antonio discovered that their daughter V.P. was drinking alcohol and smoking marijuana with friends at school. Her grades suffered and complaints came flowing in from the school. V.P. was threatened with suspension if her behaviors didn't improve. When her parents discovered alcohol and a marijuana cigarette in her bedroom, they took away her cell phone. She resisted. Her negative behaviors continued. A few days later, V.P. snuck out of the house to meet some friends in the middle of the night, *i.e.*, AWOLed. The friends stole a car, and got caught by police. Because V.P. was a minor, she was not arrested.

35. V.P. was, however, taken into "temporary custody" by Police DOES 1-10, without a warrant and in the absence of any immediate danger to the child. Instead of returning her to parents, Police DOES 1-10 transported her to the County's "Assessment Center" and released her to the Alameda County Social Services Agency and County DOES 11-20, inclusive.

– ***The County Removes V.P. From Her Parents' Custody on February 1, 2024 Without a Warrant And in The Absence of Any Exigent Circumstance***

36. As noted above, on February 1, 2024, Police DOES 1 - 10, delivered V.P. to the custody of Alameda County Children And Family Services Agency, including to Myesha Walker-Lillard and County DOES 11-20, inclusive. On information and belief, without conducting any investigation, as required under California Welfare and Institutions Code §309, Defendants Myesha Walker-Lillard and County DOES 11-20, inclusive, made the decision to seize and did seize and detain Plaintiff V.P. from her parents' custody and care, without a warrant and without any evidence to suggest she was in immediate danger of suffering severe bodily injury or death – at the hands of her parents – in the short time it would have taken to obtain a warrant or other similar such order authorizing her removal and detention.

37. In doing so, Defendant Walker-Lillard and County DOES 11-20, inclusive, and each of them refused to, and refrained from, exploring whether any lesser intrusive alternative means existed to ameliorate any perceived threat, real or imagined, to V.P. At that point in time there was no evidence to suggest V.P. was in any immediate danger at all. Indeed, she appeared to be a healthy 14 year old child in relatively good spirits.

38. Prior to making the decision to seize and detain V.P. from her parents' custody, Defendant Walker-Lillard and DOES 11-20, and each of them, failed to conduct a reasonable investigation to ascertain what facts, if any, supported their decision to seize and detain the child.

39.  As part of their process in making the decision to seize and detain the child from her parents' custody, Defendant Walker-Lillard consulted with her supervisor(s), County DOES 11-20, and shared all pertinent information she had gathered at that point in time.

40.  In spite of the fact that Walker-Lillard had refrained from completing and/or failed to complete a reasonable investigation, and with full knowledge that there were no exigent circumstances supporting V.P.'s unwarranted seizure, County DOES 11-20, inclusive, approved the decision to seize V.P. without first obtaining a warrant and directed Walker-Lillard to do so, in spite of the fact that no exigent circumstances existed.

–    ***The County, And Defendant DOES 11-20, Conduct an Unwarranted Medical Examination And Assessment on V.P., Without Her Parents' Knowledge and/or Consent***

41.  On information and belief, once V.P. was at the "Assessment Center," as per well established County procedures, practices, and policies, DOES 11-20 subjected V.P. to a medical examination and/or participated in making the decision to do so. Indeed, on information and belief, it is the well established practice to subject every child that is taken into protective custody to such an examination without any parental notice, consent, and/or involvement – and without a specific court order permitting the examination – whether there is a medical need/necessity or not.

42.  This examination is not intended to treat or heal the child, but rather is invasive and investigatory in nature. Defendants DOES 11-20, and each of them, undertook and completed this examination on V.P. without a court order or warrant permitting it, and without the knowledge, consent, or presence of her parents.

43.  Indeed, the County takes the position that once a child is in the County's temporary protective custody, it can direct the child's medical care and

1    maintenance, including its intake examinations and even routine medical care of
2    the child without any further parental involvement at all. And, the County trains its
3    social workers accordingly.

4    – ***Defendant Roxana Jimenez Files a "Petition" Which She Signs Under Penalty***
5    ***of Perjury to Initiate a Juvenile Dependency Case; She Knowingly Includes***
6    ***Incomplete And Untrue Information in the Petition***

7    44.    On February 2, 2024, Defendant Roxana Jimenez filed her Petition with the
8           Superior Court of Alameda County under WIC 300(b) to initiate a juvenile
9           dependency action regarding V.P. She attested to the facts contained in the
10          Petition, including the charging allegations, under penalty of perjury.

11   45.    In her Petition, Defendant Jimenez claimed that Plaintiffs Carlota and Antonio
12          physically abused their daughter. None of the allegations were true. Indeed, V.P.
13          fought frequently with other kids at school – not with her parents. Not physically
14          anyway. Nonetheless, on information and belief even though she was aware, or
15          should have been aware based on the minimal investigation done at that point in
16          time, that the allegations were false, Defendant Jimenez drafted the petition,
17          signed it under penalty of perjury, and filed it with the Juvenile Court knowing it
18          contained false information. Specifically, that V.P.'s parents had subjected her to
19          physical abuse. Defendant Jimenez knew or should have known this was not true
20          at the time she signed the Petition under penalty of perjury.

21   – ***V.P. Immediately Goes AWOL From The County Assessment Center***

22   46.    On February 2, 2024, before the false Jimenez Petition was even filed, V.P. went
23          AWOL from the County's "Assessment Center" together with another youth who
24          was "well known" to the County.[1] V.P. did not return to the Assessment Center
25          until two days later on February 4, 2024. During her interview by County

26   _____

27          [1]This AWOL event, as well as her AWOL history as disclosed by her parents put
     the County on notice that the teen was at high risk of AWOL and other similar high risk
28   behaviors, which included alcohol and drug abuse (marijuana) as well as fighting and
     cavorting with older (adult) men.

1    Defendant DOES 12 and 13, V.P. disclosed that she had two *adult* "boyfriends"[2]

2    with whom she wanted to "remain around." Indeed, when she was recaptured by

3    the County after her AWOL event, she was found across the street from the home

4    of one of these adult "boyfriends."[3]

5    –    ***On February 5, 2024, Defendants Jimenez And Phillips Draft And File Their***

6    ***Detention Report With The Juvenile Court; The Report Contains False,***

7    ***Incomplete, And Misleading Information; The Court Accepts it Into Evidence***

8    ***And Relies on it to Continue V.P's Detention in County Care/Custody***

9    47.    Several days after V.P. was returned from her AWOL event, on February 5, 2024,

10    Defendant Jimenez drafted her Detention Report.[4] On information and belief, upon

11    drafting the Detention Report, Jimenez then gave the report to her supervisor,

12    Defendant Nicole Phillips who reviewed the Report in detail as well as the

13    CWS/CMS Contact Notes and delivered service logs to familiarize herself with

14    the underlying investigative materials.[5] Defendants Jimenez and Phillips then met

---

[2] At this point in time, V.P. was a pretty, 14 year old, teenage Hispanic girl. It is well known in social work practice that runaway foster children are quickly captured and sexually exploited – typically by adult males. Indeed, the County has a specific acronym for it – "CSEC," and trains its workers to be on the lookout for CSEC victims or potential CSEC victims in its foster youth population. The fact that V.P. admitted to having these adult male "boyfriends" and was recaptured from one of them, was a major red flag that she was a victim or potential victim of child sexual exploitation.

[3] Defendant Jimenez knew of V.P.'s tendency to run away, *i.e.*, AWOL, as her parents had already disclosed this tendency, and V.P. confirmed it by immediately running away from the Assessment Center.

[4] The Detention Report is the primary evidentiary document the judge will rely on in making his/her decisions at the detention hearing (similar to an arraignment in the criminal context).

[5] The CWS/CMS system is a state wide database owned, operated, and maintained by the State of California. All California counties have access to it and are required to enter their child welfare services data into it. There is a particular function available in the CWS/CMS system called "Contact Notes." It is also sometimes referred to as the "Delivered Services Log." All county social workers, like the Defendants in this case, are trained that the Contact Notes/Delivered Service Logs are to be completed at or near the time of the events recorded. They are also trained that the information recorded there is required to be truthful, honest, accurate, and complete. The reason for this requirement is that the Contact Notes are an official record of the State of California; other government workers who perform other functions in the case (perhaps at a later time) will read and

and conferred, either by telephone or in person, to discuss the contents of the Detention Report as well as the entirety of the information gathered during the underlying investigation – minimal as it was.

48.    On information and belief, during this discussion, Defendant Phillips reviewed the Detention Report and the other records that had been gathered so far, as well as Defendant Walker-Lillard's investigation notes including the interview notes of discussions had between Defendants Walker-Lillard and DOES 1-20 on the one hand, and the Plaintiffs on the other hand.

49.    Defendants Jimenez, Phillips, and DOES 11-20 then created their fraudulent Detention Report. On information and belief, Defendants Jimenez and Phillips and DOES 11-20, and each of them, definitively knew that  the "story" set out in their Detention Report was false, incomplete, and misleading, presenting Plaintiffs (the parents) in a false and negative light.

50.    For example, on information and belief, both Defendants Jimenez and Phillips were aware V.P. did not, in fact, suffer any form of severe injury at the hands of her parents, and that her parents, and co-plaintiffs herein, had done nothing more than exercise reasonable discipline upon their unruly child to take away her cell phone after she got in trouble at school, got caught with/using alcohol and marijuana, and got caught in a stolen car with some delinquent friends. Nonetheless, Defendants Jimenez and Phillips worked together to draft their Detention Report, and in doing so, refrained from including this exculpatory information, and instead made up a false narrative to support Defendant Walker-Lillard's unwarranted seizure of V.P.

51.    Once the report was complete Defendant Phillips, Jimenez's supervisor, reviewed

---

rely on the Contact Notes/Delivered Service Logs in making important case decisions; and, on occasion, the material in the Contact Notes/Delivered Service Logs may even be relied upon by the judge assigned to the juvenile dependency case, if a dependency case is filed. For example, workers who become involved in the case later are reasonably likely to rely on the Contact Notes in fashioning their reports to the Juvenile Court.

it in detail and approved of its contents without taking any steps to verify the truth and/or accuracy of the information contained in the report. On information and belief, the two agreed to craft the language of their report in such a manner as to fraudulently paint Plaintiffs as abusive and neglectful parents in order to justify V.P.'s unwarranted seizure and continued detention.

52. Both Jimenez and Phillips are, and were, aware that the Detention Report is the primary evidentiary document the Juvenile Court will rely on at the Detention Hearing. If the so called "evidence" contained in the Detention Report is sufficient to make a *prima facia* showing, false or not, then the child will typically continue to be detained pending a full trial.

53. Indeed, as a matter of law, the Juvenile Court presumes the truth of the matters set forth in the Detention Report for purposes of determining whether or not a *prima facia* showing has been made. Thus, it is critically important that social workers and their supervisors, *i.e.*, those in Jimenez's and Phillips' position be truthful, honest, accurate, and complete in their reporting to the juvenile court, especially in the context of their Detention Reports that are filed with the court.

54. As noted above, within the body of their Detention Report, Jimenez and Phillips created a materially false narrative replete with false information, fabricated facts, and incomplete/misleading statements. For example, but not limited to:

   a. In their Detention Report, Jimenez and Phillips falsely state that "Reasonable Efforts were made to prevent or eliminate the need for [V.P.'s] removal from the home;" This was a complete lie. In truth, no efforts were made at all to avoid the removal of the child. Indeed, there was only a minimal effort, *after* the child had already been seized and detained to even interview witnesses, let alone safety plan or otherwise pursue lesser intrusive alternatively means of averting any real or imaginary perceived threat to the child.

   b. In their Detention Report, Jimenez and Phillips falsely state that "the child

faced imminent danger and could not be protected from this danger in the home without removal." But, in truth, there was no danger to the child at all and both of these Defendants knew, or should have known it.

c.     In their Detention Report, Jimenez and Phillips falsely state that "There is a substantial danger to the physical health of the minor or the minor is suffering severe emotional damage, and there are no reasonable means by which the minor's physical or emotional health may be protected without removing the minor from the parent's [] physical custody." This was not true at all. Indeed, as noted above, Jimenez and Phillips were aware, and failed to report to the Court, that V.P.'s parents had done nothing more than exercise their parental discipline privilege.

d.     In their Detention Report, Jimenez and Phillips also falsely reported that there were no known relatives who could care for the child as an alternative to placement in foster care. This simply was not true at all, and both Jimenez and Phillips knew it. Indeed, they had been informed and were well aware that several relatives had offered up their homes as a temporary placement for V.P. during the ensuing proceedings.

e.     Finally, in their Detention Report, Jimenez and Phillips falsely stated that "The minor was removed from the care of her parents *via* search and seizure warrant on February 1, 2024 due to concerns related to physical abuse towards the minor." This was not true at all. In fact, no such warrant had ever been sought or issued.

The above list is intended as exemplar only and is not to be considered as an exhaustive list of the false statements reported to the Juvenile Court by Defendants Jimenez and Phillips in their Detention Report.

55.     On information and belief, Defendants Phillips and Jimenez further agreed to suppress, and did suppress, from their report, known material information that would have made a difference to the outcome of the case.

1    56.  For example, Defendants Jimenez and Phillips knowingly refrained from

2         disclosing to the Court regarding V.P.'s repeated and serial AWOL activities both

3         prior to her detention and after. Nor did these Defendants report the fact that V.P.

4         had immediately AWOLED from County custody as soon as they had her, and that

5         she was later found in the company of/in close proximity to one of her adult

6         "boyfriends."[6]

7    57.  Finally, Phillips and Jimenez failed to advise the Court of V.P.'s chronic drug and

8         alcohol abuse, and the effect it was having on her at school and in her social and

9         familial relationships. All of this was important information that was known and

10        available to these Defendants well before they filed their Detention Report. Yet,

11        for some undisclosed reason, it was withheld from the Juvenile Court. Had the

12        Court been made aware that V.P. posed a substantial AWOL risk, was a chronic

13        drug and alcohol abuser, and was a potential CSEC risk, substantial protective

14        measures would likely have been ordered to be put in place.

15   58.  Once these Defendants completed drafting their false and incomplete Detention

16        Report, both Jimenez and Phillips signed the Detention Report and caused it to be

17        filed with the Juvenile Court on, or about, February 5, 2024.

18   59.  Defendants knew the information in their Detention Report, a well as their

19        recommendations, and conclusions were false, misleading, and incomplete, at the

20        time they signed and filed their Detention Report – but they filed it anyway.

21   60.  At the time they filed their Detention Report both Jimenez and Phillips intended

22        that the judge hearing the case accept their materially false, incomplete and

23        misleading report into evidence and rely on it in making his/her decisions

24        concerning V.P.'s continued detention and the alleged basis for it.

25

26   ───────────────────────

27        [6]This should have been a major red flag, *i.e.*, a major indicator that V.P. either
     already was a CSEC victim or was well down the path to becoming one. Yet, no reports
     were made to law enforcement or to the appropriate Child Welfare agency. In fact, V.P.'s
28   County Placement Workers (DOES 11-15) made efforts to place V.P. in the same locale
     so that she "could" maintain contact with her so called "boyfriends."

1
2
3
4
5
6
7
8
9
10

61.    When they submitted their fraudulent, incomplete, and misleading Detention Report to the Juvenile Court, due to their extensive training and experience, Jimenez and Phillips knew with near certainty that their Detention Report would be the primary evidentiary document the juvenile court would rely on in making its decision at the Detention Hearing (which is akin to an arraignment in the criminal context). When they submitted their Detention Report it was Jimenez and Phillips' intention that the juvenile court accept their fraudulent report into evidence, accept the statements therein as true, accurate, and complete, and render its decision based on the false "facts" contained in these Defendants' fraudulent Detention Report.

11
12
13
14

62.    Had Defendants Jimenez and Phillips been truthful and complete in their reporting, it would have made a difference in the outcome in that V.P. would have very likely been ordered to be immediately returned to the custody of her parents at the Detention Hearing as there was no honest basis to continue to detain her.

15
16
17
18
19
20
21
22
23

63.    The Detention Hearing was held on February 5, 2024. At the hearing, predictably, the Court accepted Defendants Jimenez and Phillips false and misleading Detention Report into evidence, read it and relied on it to decide that V.P. should remain in County custody and care. The Court also ordered that the agency had discretion to place V.P. in a "group home, hospital, or other treatment facility" or to "release the child [back] to the mother [or] father." The Court also ordered that the mother and father would retain V.P.'s educational rights and that the social worker had "discretion to release [V.P.] to [her] parents with 5 days notice to all parties."[7]

24    –    ***Roxana Jimenez Rejects All of V.P.'s Relatives For Temporary Placement***

25
26

64.    On February 6, 2024, at an emergency Child And Family Team Meeting, in spite of the fact that the Court had expressly given her the power to place V.P. with

27
28

[7]The Court reiterated this part of its order twice.

relatives or even return her to her parents, Ms. Jimenez rejected all relatives who were presented as options for V.P.'s temporary placement. This included V.P's adult sister, her paternal cousin, her maternal aunt, and two sets of godparents. Each of these in turn was rejected by Ms. Jimenez for one trumped up reason or another. None of V.P.'s relatives were good enough.

65. The next day, February 7, 2024, Defendant Hopson, a County Placement Worker spoke to V.P. During the conversation Defendant Hopson learned that V.P. wanted to be placed near Newark to be closer to her adult "boyfriend" that she "needed" to stay connected with.[8] Once Defendant Hopson had finished her chat with V.P., she spoke with staff at the County Assessment Center who disclosed to her that V.P. in fact had *two* adult boyfriends in the Tri-City area and that when she went AWOL just a few days prior, she had gone to visit one of them.[9]

66. Upon learning this information, Defendant Hopson failed to take any action to protect V.P. from further exploitation, *i.e.*, make any sort of report – mandated or otherwise – or even follow up to ascertain who these adult "boyfriends" were or what business they had associating with at 14 year old female child.

– ***V.P. is Placed Out-of-County Without Notice to Her Parents or a Court Order; She AWOLS Yet Again***

67. V.P. remained at the County's Assessment Center only until February 8, 2024, when she was placed with Theresa Garza in Modesto, CA. Mrs. Garza was a certified foster provider with Lifecare Outreach, a Foster Family Agency.

68. This placement was outside of Alameda County. When Defendant Hopson made the decision to place V.P. outside of Alameda County she refrained from so advising the Court and/or obtaining a Court order permitting it. Moreover, she refrained from informing the parents and/or obtaining their consent to the move.

---

[8]This information presented yet another red flag indicative of CSEC risk.
[9]Yet another strong indicator of CSEC risk.

69. As part of the process of placing V.P. out-of-county, V.P. was also required to change schools. At this point in time, the Plaintiff parents continued to maintain full educational rights. Nonetheless, Defendant Hopson withdrew V.P. from her then current school and moved her to a school in Modesto, CA without her parents' knowledge and/or consent and without an authorizing Court order.[10] On information and belief, Alameda County habitually ignores legal mandates like this one, opting instead for expediency as opposed to compliance with the legal mandates.

70. When the parents finally discovered that V.P. had been moved to Modesto and changed schools they complained to Defendant Jimenez. But Jimenez shut them down saying, "there are not enough resource homes in the Bay Area and the placement unit reaches out to their contacts outside of Alameda County." Defendant Jimenez also falsely claimed that the Agency is also "allowed to place in a home outside of the Bay Area as well as enroll the minor into a school near their placement especially if it is too far to try to keep the minor in their school of origin."[11]

71. Sometime on February 20, 2024, V.P. AWOLed from Mrs. Garza's home in Modesto. Defendant Jimenez learned of the AWOL that same day. Yet, she refrained from advising V.P.'s parents that V.P. had gone missing until two weeks later on March 6, 2024. It is unclear why this information was suppressed and

---

[10] The Welfare and Institutions Code governs the policies and procedures for the Department of Children and Family Services, including placing a minor dependent out of the county of their origin absent an emergency. WIC 361.2 (g) (1) states that if the child is taken from the physical custody of the child's parent, guardian, or Indian custodian and unless the child is placed with relatives, the child shall be placed in foster care in the county of residence of the child's parent, guardian, or Indian custodian in order to facilitate reunification of the family.

[11] This admission by Jimenez is evidence of the County's deliberate decision to refrain from following legal mandates put in place to preserve and protect the rights of parents and children who become involved in the child welfare system in Alameda County.

1    hidden from the parents.[12]

2    72.    The next day, in her February 21, 2024 interview with V.P.'s parents, V.P.'s

3    mother expressed concern that "someone older [was influencing] and manipulating

4    her daughter" and urgently requested that Ms. Jimenez investigate further. But,

5    Ms. Jimenez refrained from taking any action at all to investigate or otherwise

6    protect V.P.

7    –    ***On February 26, 2024, Defendants Jimenez and Phillips File Their***

8    ***Jurisdiction/Disposition Report With The Juvenile Court; They Leave Out***

9    ***Important Material Information***

10   73.    On February 26, 2024, Defendants Jimenez and Phillips drafted and filed their

11   Jurisdiction/Disposition Report. In doing so, the two made the following material

12   omissions and false statements:

13        a.    In their Jurisdiction Report these Defendants fail to disclose the full extent

14             and gravity of V.P. history of serial AWOLs and other exceedingly risky

15             behaviors, i.e., drug and alcohol use/abuse, fighting, and cavorting with

16             older adult males when AWOL. Moreover, the Defendants minimize that

17             fact that as of the date of the filing of the Jurisdiction Report, V.P. had still

18             not been recovered from her February 20th AWOL event and in fact

19             remained on the streets out of contact and unaccounted for.

20        b.    Also in their Jurisdiction Report these Defendants mention Kristina Grisso

21             as a potential placement for V.P., but fail to disclose the nature of the lack

22             of any relationship between Kristina Grisso and the family, or the fact that

23             Grisso did not qualify as a Nonrelative extended family member. Indeed, by

24             implication these Defendants claimed she was a NREFM. But this wasn't so

25             – *at all*. Indeed, a "nonrelative extended family member" is statutorily

26   _____

27        [12]Moreover, this was a further indicator that V.P. required a much higher level of
     care and supervision that the County was providing given her constellation of risk
28   factors, i.e., serial AWOL behaviors, drug and alcohol abuse, and her age and gender all
     combined with her proclivity to cavort with much older adult males.

defined as an adult caregiver who has an established familial relationship with a relative of the child, as defined in paragraph (2) of subdivision (c) of Section 361.3, or a familial or mentoring relationship with the child. See, WIC 362.7. Also, by law, in order to consider placement with a NREFM, "the county welfare department shall verify the existence of a relationship through interviews with the parent and child or with one or more third parties. The parties may include relatives of the child, teachers, medical professionals, clergy, neighbors, and family friends." Defendant Grisso met none of the requirements. Yet none of this was disclosed to the Court.

74. The Jurisdiction Report disclosed that there were two individuals being considered for "Placement Plans" – Jorge Pantoja (V.P. adult cousin) and Kristina Grisso (a stranger to the family who V.P. knew through a "friend"). Both individuals were "pending" RFA approval according to the report dated February 26, 2024. Even though the agency is required to give preferential placement consideration to relatives, *i.e.*, Jorge Pantoja, on information and belief, Jimenez, Phillips, and DOES 11-20, and each of them, intentionally refrained from doing so.

– ***V.P. Returns From Her AWOL Excursion on March 6, 2024 And Requests That She be Placed With Defendant Grisso – a Stranger to The Family***

75. On March 6, 2024, V.P. finally reappeared and presented herself at the County's Assessment Center. Defendant Jimemez met with her there. V.P. requested of Jimenez that she be placed with Defendant Grisso. Without conducting any assessment of Ms. Grisso or her home – *at all*, and without first disclosing her unilateral selection of Grisso as V.P.'s care provider to V.P.'s parents, Defendant Jimenez agreed to V.P.'s request and submitted her request for Resource Approval for Defendant Kristina Grisso.

76. In her application/request, Defendant Jimenez falsely claimed that Grisso was a Non-Relative Extended Family Member (NREFM). As noted *supra*, this wasn't true at all. Not only did Defendant Grisso not meet any of the requirements, but

Defendant Jimenez didn't interview anyone regarding Grisso's relationship with the child – other than in a single conversation she had with V.P. where V.P. demanded to be placed with Grisso. In fact, V.P.'s parents didn't even know who Grisso was, how she knew or had contact with their daughter, or even where she lived.

77. In spite of all this, the wheels were in motion. For some unknown reason, *i.e.*, a reason not disclosed in any of the agency records produced to-date, or to the Court in the various reports the Defendants filed, Defendants (DOES 11-20) dropped any and all efforts to locate and/or approve a family member or relative for V.P.'s placement. This included Jorge Pantoja, whom Defendants Jimenez and Phillips had already identified as a willing relative placement.

78. Almost immediately, once the secret deal to place V.P. with Defendant Grisso was made, V.P. AWOLed from the Assessment Center, *i.e.*, the next day, March 7, 2024.

– ***Grisso Has an Extensive And Colorful Criminal History Including Felony And Misdemeanor Arrests And Convictions Which Pose an Obvious, Immediate, And Unreasonable Risk to V.P.'s Health, Welfare, And Safety***

79. On, or about, March 7, 2024, working on an expedited basis, at Defendant Jimenez's request, Defendant Shaterra Grant called Ms. Grisso on the phone and learned the following: (1) That Grisso was a past drug addict; (2) That she currently worked at a methadone clinic; (3) That Grisso was in the process of getting divorced; (4) That V.P. had secretly gone to Grisso's house during her many AWOL events; (5) That Grisso knowingly harbored V.P. during her AWOL events; and, (6) That Grisso secretly provided V.P. with money when she was at the County's Assessment Center prior to V.P. AWOLing from the center. These were all red flags indicating that Ms. Grisso was not a safe placement for V.P.

80. In addition, at the time Defendant Jimenez made the deal to place V.P. under Defendant Grisso's custody and care, on information and belief, Kristina Grisso

had a long and colored criminal history which included convictions for serious misdemeanors and felonies as well as multiple arrests spanning a period of many years – many of which were related to drug use/abuse and acts of violence. Indeed, prior to "approving" V.P.'s placement in the Grisso home, Defendant Grant did a comprehensive search of Grisso's criminal back ground and discovered the following criminal history:

a.    Allegations of General Neglect of a child on 8/20/21;

b.    POSSESS CONTROLLED SUBSTANCE on 2/24/12, (MISDEMEANOR);

c.    POSSESS CONTROLLED SUBSTANCE on 11/20/12, (FELONY);

d.    Family Court RFA on 02/06/24;

e.    Family Court DVRO on 03/13/24;

f.    Arrested on 02/8/2021 for PC 245(A)(4) - Assault w/Force - Likely To Produce Great Bodily Injury;

g.    Arrested on 12/15/2015 for PC 11377(A) - Possession of Controlled Substance; PC 466 - Possession Of Burglar's Tools; PC 470(A) - Forgery; PC 496 - Receive/Etc. Known Stolen Property Over $200; PC496(A) - Receiving Or Concealing Stolen Property; PC 10851 - Vehicle Theft; PC 20002 - Hit And Run; PC 2800.2 - Evading P.O., Wanton Disregard For Safety; PC11364.1A - Possession of Drug Paraphernalia; PC530.5A - Unlawful Use of Willfully Obtained Personal Identifying Information; PC 22610(A) - Convicted Felon Purchase or Possess Stun Gun; PC22810(A) - Felon Purchase / in Possession or Use of Tear Gas; PC 530.5C1 - Possess of Personal Identifying Information of Another Person with Intent to Defraud.

h.    Arrested on 10/20/2015 for PC 466 - Possession Of Burglar's Tools; PC" 496(A) - Receiving Or Concealing Stolen Property;

i.    WARRANT - Warrants Or Holds Only for PC 11364.1A - Possession of Drug Paraphernalia; PC22610(A) - Convicted Felon Purchase or Possess Stun Gun; PC 22810(A) - Felon Purchase / in Possession or Use of Tear

1    Gas;

2    j.    Arrested on 12/2/2014 for PC 1203.2 - Revocation Of Probation; PC 466 -

3          Possession Of Burglar's Tools; PC 496 - Receive/Etc. Known Stolen

4          Property Over $200; PC 496(A) - Receiving Or Concealing Stolen Property;

5          PC 10851 - Vehicle Theft; PC 20002 - Hit And Run; PC 2800.2 - Evading

6          P.O.: Wanton Disregard For Safety; PC 11364.1A - Possession of Drug

7          Paraphernalia; PC 22610(A) - Convicted Felon Purchase or Possess Stun

8          Gun; PC 22810(A) - Felon Purchase / in Possession or Use of Tear Gas;

9    k.    Arrested on 6/29/2013 for PC11377(A) - Possession of Controlled

10         Substance; PC 11364 - Possess Control Substance Paraphernalia; PC

11         11550(A) - Use/Under Influence Controlled Substance; PC496 -

12         Receive/Etc. Known Stolen Property Over $200; PC 10851 - Vehicle Theft;

13         PC 20002 - Hit And Run; PC 2800.2 - Evading P.O.: Wanton Disregard For

14         Safety;

15   l.    Arrested on 2/24/2012 for PC 11377(A) - Possession of Controlled

16         Substance;

17   m.    Arrested on 8/1/2012 for PC 11377(A) - Possession of Controlled

18         Substance; PC 11364.1A - Possession of Drug Paraphernalia;

19   n.    Arrested on 9/9/2008 for PC    11364 - Possess Control Substance

20         Paraphernalia; and

21   o.    Arrested on 3/13/2008 for PC 148(A)(1) - Resist / Obstruct / Delay Peace

22         Officer.

23   81.  In all, Kristina Grisso had been arrested approximately 12 times in 17 years. With

24         this demonstrated history of irresponsible and criminal behavior, it was or would

25         have been clear to any reasonable government social worker in Defendants'

26         circumstances that Kristina Grisso was not a safe or appropriate placement for

27         V.P. Nonetheless, on information and belief Defendants Jimenez, Phillips, Grant,

28         and District Director Buckner-Preston, consulted together, reviewed all data that

had been gathered regarding Defendant Grisso to-date including but not limited to her extensive known criminal history and decided together to place V.P. in Grisso's custody, supervision, and care. This was all done in spite of the fact that qualified relatives had been located and were willing to accept V.P. into their homes. In fact, V.P.'s qualified relatives were bypassed, without cause, in favor of Grisso.

82. Of note, until very recently Defendant Grisso cavorted with Jason Arvizu – supposedly her ex-boyfriend who was a known drug user and dealer. But, coincidentally, on March 13, 2024, the exact same day V.P. was placed in her home, Grisso filed for a TRO against him.

83. On information and belief, Defendants Jimenez, Phillips, Grant, and District Director Buckner-Preston failed to inquire and fully assess the Grisso home and thereby abdicated their responsibility to protect V.P. To wit: They either did not inquire about the adult males that frequented Grisso's home (including Jason Arvisu) and/or ignored the fact that Defendant Grisso had adult male "boyfriends" who were known drug abusers and/or dealers that would frequent her home.

84. On March 13, 2024, on information and belief Defendants Jimenez, Phillips, Grant, and District Director Buckner-Preston, and each of them, consulted with Defendant Melissa Fergurur (Placement Program Manager) and shared all of the above information regarding Ms. Grisso. Upon receiving the information, and consulting with these Defendants, and each of them, Defendant Fergurur approved the placement knowing definitively that, at least based on Grisso's known background, she was not a safe and/or appropriate placement for V.P.

85. That same day, the County "officially" placed V.P. under the care and supervision of Defendant Grisso. Defendant Grant visited V.P. at the Grisso home. On information and belief, the home was in disarray and did not appear appropriate to meet V.P.'s known needs. Indeed, V.P.'s placement with Grisso proved troublesome, and even dangerous to V.P., from the beginning.

*– V.P. Complains She is Not Receiving Adequate Care; Grisso Refuses to Attend Training And Refuses to Allow Defendants Into Her Home; SWAT Raids The Grisso Home; Defendants do Nothing to Protect V.P. or Ensure Her Safety*

86. On March 28, 2024, V.P. met face to face with Defendant Jimenez and complained that shed did not feel supported by the agency because she had not been provided essential mental health services, *i.e.*, therapy, had not been seen by a medical doctor, and had not been enrolled in school. Upon receiving V.P.'s complaints, Defendant Jimenez did nothing to rectify or address the noted deficiencies.

87. On information and belief, sometime between March 28, 2024 and April 10, 2024, Defendant Angelina Ramos was assigned as V.P.'s case worker.

88. Defendant Grisso was enrolled for mandatory Pre-Service training for April 13th and 20th. This is training Grisso was required to take in order to be an approved placement for V.P. She was a "NO SHOW" on both dates. This was another *major* red flag that required agency attention. Yet, nobody from the agency even bothered to follow up until a month later on May 15, 2024 – long after V.P. had been placed with Grisso and left under her "care" and "supervision."

89. On April 22, 2024, Defendant Ramos met with V.P.'s parents. V.P.'s parents complained that they were concerned about V.P.'s safety, that they did not know who Grisso was and that Grisso was allowing V.P. to smoke marijuana in the home. Indeed, during their prior supervised visit with V.P., her blanket wreaked of marijuana. Defendant Ramos took no steps whatsoever to follow up on these issues, investigate them, or even speak with V.P. and/or Grisso about V.P.'s persistent marijuana use in the Grisso home.

90. That same day, Defendant Ramos spoke by telephone with Defendant Grisso, but did not even bring up the complaints and concerns raised by V.P.'s parents. Instead she advised Grisso that "another CWW would be calling to complete [the required] face to face visit with [V.P.] for April" CWW Celia Zamora called Grisso to arrange to visit V.P. at the Grisso home. Grisso refused to allow the visit

1    to be conducted in her home, saying instead that V.P. "Ha[d] other appointments

2    after school." So CWW Zamora went to V.P.'s school and conducted her visit

3    there.[13]

4    91.   Just a couple weeks later on May 9, 2024, Defendant Ramos again attempted to

5          schedule an in-home visit in the placement with Grisso. Grisso again made

6          excuses. This time claiming that she was having work done in the home and that

7          she was staying in a Motel 6 with V.P. This disclosure alone should have been a

8          red flag that something was seriously amiss with the Grisso placement. Not only

9          did Grisso continue to refuse to allow V.P.'s case worker to see her home, but now

10         she was living in a Motel 6 with V.P. nonetheless, Defendant Ramos did nothing

11         to look after, protect, or secure V.P. or otherwise ensure her continued safety in

12         Grisso's care.

13   92.   On information and belief, it was at about this time in May 2024, that the Union

14         City Police Department SWAT team raided Ms. Grisso's home looking for

15         Grisso's recent ex-boyfriend, Jason Arvizu, a known gang leader and drug dealer.

16         During the raid, on information and belief, V.P. and at least one other child were

17         in the home. On information and belief the fact of the raid, the results, the reason

18         for the raid, and the danger it posed to the children were all known and/or

19         disclosed to Defendant Ramos. Indeed, the damage done to the home during this

20         raid is the reason Ms. Grisso and V.P. were now staying at a Motel 6.

21         Notwithstanding, Ms. Ramos did nothing to protect V.P. from further harm and/or

22         ensure her continued safety, security and/or supervision in the

23         care/custody/control of Ms. Grisso.

24   93.   A few days later, on May 13, 2024, Defendant Ramos again attempted to conduct

25         a home visit at the Grisso home. Again Grisso refused claiming she and the

---

[13]While standing alone Grisso's avoidance of this singular I have a lot visit would not normally be concerning, it is the first refusal to cooperate in visitation in a pattern of similar such refusals that taken together are a major red flag.

1    children were still living in a Motel 6.

2    94.    The following week on May 20, 2024, Defendant Ramos again attempted to

3    conduct a home visit at the Grisso home. This time Grisso was blunt, saying she

4    was "not at home and [were] unavailable."

5    95.    For the entire month of May 2024, Defendant Ramos never once visited Grisso

6    face to face, or saw the inside of her home.

7    96.    On June 5, 2024, Defendant Ramos received a concerning telephone message from

8    Lorena Vasquez, V.P.'s therapist. Ms. Vasquez expressed serious concern about

9    Grisso stating "I called foster mom today to confirm appointment for tomorrow

10   and I was a bit concerned about the way foster mom sounded on the phone. I asked

11   if everything was alright and she·said yes but it seemed like she was giving short

12   answers and avoided my question about where VP was. Her words seemed a little

13   slurred and drawn out." This was yet another major red flag. Nonetheless,

14   Defendant Ramos refrained from calling Ms. Vasquez back, or from taking any

15   steps at all to check in on V.P. in placement or otherwise ensure that she was safe.

16   97.    On June 6, 2024, Defendant Ramos again reached out to Defendant Grisso to

17   attempt to set a time to visit her home. She was unable to contact Defendant

18   Grisso and left a voice message. Defendant Grisso did not return the call until June

19   17, 2024 – days after V.P. had been brutally raped by one of Defendant Grisso's

20   drug addled associates.

21   98.    In spite of all the foregoing red flags and deficiencies, Defendant Division

22   Director Mia Buckner-Preston approved V.P.'s continued placement in the Grisso

23   home – knowing this was an inappropriate and even potentially unsafe place for

24   V.P.

25   99.    As noted, on June 17, 2024, after two months and multiple attempts to do a home

26   visit, Grisso returned Defendant Ramos' call and agreed to an appointment for a

27

28

1
2
3
4
5

home visit for June 20, 2024.[14] But, in spite of her agreement to allow the home visit, June 20th came and went with yet another excuse for why Defendant Ramos would not be allowed to do a home visit – and still Defendant Ramos did nothing. She didn't report it to her supervisor, she didn't escalate the issue, she didn't even attempt an unannounced visit. She simply did nothing.

6
7
8
9
10
11
12

100.   That same day, June 20, 2024, after Defendant Ramos had failed for months to follow up with V.P.'s therapist – the therapist reached out and advised Defendant Ramos that V.P. hadn't " shown up for a session for the past 4 weeks." She further complained about the foster mother [Grisso's] dishonesty. These are major red flags! Had Defendant Ramos spoken to V.P.'s therapist at least once a month, as required, she would have known of the bourgeoning problem and been able to address it.

13
14
15

–   ***After Defendants Ignore Glaring Red Flags For Months, V.P. is Brutally Raped And Sodomized in The Grisso Home; Defendants Leave Her in Grisso's Care in Spite of Obvious Dangers***

16
17
18
19
20
21

101.   Defendant Grisso had a habit of leaving V.P. in the care of her minor daughter and others without any appropriate supervision. On information and belief, Defendants were aware of this, but allowed the habit to persist without repercussions. As was her habit, on June 13, 2024, Defendant Grisso went out with friends, got drunk and was unable to drive home. V.P. was left with Grisso's minor daughter and adult daughter alone in the Grisso home.

22
23
24
25
26
27

102.   In the early morning on June 14, 2024, V.P. woke up alone and unattended. When all of a sudden an associate of Defendant Grisso, Daniel Nieves, appeared in her bedroom. Daniel Nieves is a known drug dealer and gang member, who was looking for Grisso's boyfriend that morning. He let himself in, offered V.P. some tequila and drugs. When V.P. refused, Nieves dragged her onto the bed by her

28

[14]This call came the day after V.P. had been brutally raped in Grisso's home

ankles, ripped off her shorts and violently raped her vaginally. Then, he turned her over on her stomach and spoke to her in child-like tones as he forced his penis into her anus and sodomized her. He continued to ejaculation. The event was so brutal that it caused V.P. to bleed so profusely that the mattress, her clothes, and a towel she used to wipe herself off were soaked in blood.

103. These acts caused the V.P. tremendous physical pain and emotional suffering. At the time of the rape, V.P. was 14 years old, was 5 feet tall and weighed less than 100 pounds. Daniel Nieves, on the other hand, was 47 years old, 6 feet tall and weighed 200 pounds.[15]

104. As Nieves was leaving, he threatened V.P. that he knew she was a foster kid and would return later for more. V.P. was left sobbing and bleeding profusely with no one to care for her. Calling for help, V.P. was picked up by a friend and taken away.

105. On information and belief, Defendant Grisso returned home and saw evidence of the rape, but failed and refrained to call law enforcement. Grisso took the bloody mattress to the backyard and kept the bloody towel and V.P.'s shorts in her car. Grisso acted like this was just another normal day in the Grisso home.

106. On information and belief, between June 14, 2024 and June 18, 2024, several people contacted Defendant Grisso on Facebook about the rape – she ignored them all. On June 19, 2024, Union City Police Department contacted Defendant Grisso about the rape and Grisso denied any knowledge. An intensive police investigation ensued.

107. On June 20, 2024, Defendant Grisso spoke with police officers and told them she thought V.P. had a urinary tract infection and that was the reason for the bloody mess. After further probing, Grisso confirmed V.P. was raped. Grisso admitted she knew Nieves and he was the rapist, and that no one was going to say anything

---

[15]V.P. was diagnosed with Post Traumatic stress disorder and experienced anxiety, depression, flashbacks, nightmares and startle response due to the trauma she endured.

1    until they moved out of the home.

2    108.    Police officers requested more information from Defendant Grisso and asked to

3    see the bloody towel and mattress, but Grisso refused to cooperate. Defendant

4    Grisso would not meet with police officers at the home, she would not show them

5    the facebook messages, nor tell the officers who the messages were from.

6    109.    Police officers requested again to meet with Grisso and V.P. and that V.P. have a

7    forensic interview about the rape. Grisso again refused. Based on the information

8    available and Grisso's unwillingness to cooperate, police officers obtained a

9    search warrant for the Grisso residence on June 21, 2024.

10   110.    On June 21, 2024, police officers contacted Defendant Grisso again in the hopes

11   of gaining her cooperation. Defendant Grisso told officers that they could not

12   come to the home and that she could no longer reside in the home since the SWAT

13   raid, one month prior. When officers asked about V.P.'s whereabouts, Grisso lied

14   and told them V.P. was at her cousin's home and refused to give them the address.

15   111.    In executing the search warrant after speaking with Grisso, officers found V.P. and

16   others in the Grisso home. They found the bloody mattress tucked away in the

17   backyard and Grisso finally turned over the bloody towel and shorts.

18   112.    Later that day, officers scheduled the forensic interview for V.P. and make a report

19   of child abuse with Alameda County Child Protective Services.

20   113.    After learning of the rape and Grisso's refusal to cooperate in the investigation,

21   Defendant Jimenez and DOES 11-20 did nothing. Indeed, they even left V.P. in

22   Grisso's care for another three days. After much discussion, Grisso voluntarily

23   relinquished custody of V.P. on June 23, 2024.

24   –    ***The Social Worker Defendants Fail to Disclose V.P.'s Rape to Her Parents; V.P.***

25   ***AWOLs Again; The Social Workers Misrepresent The Facts Surrounding the***

26   ***Rape to The Juvenile Court***

27   114.    V.P. is taken to the Assessment Center. But, Defendants refrain from contacting

28   V.P.'s parents or other family members to support V.P. and/or take care of her. In

a traumatic state, left utterly untreated and alone, V.P. blames herself and is allowed by Defendants DOES 11-20 to go AWOL from the County's Assessment Center again.

115. Defendant Ramos refrains from informing the parents about V.P.'s rape and subsequent AWOL until June 24, 2024.

116. In a new detention petition, Defendants Jimenez and Phillips refrain from telling the Juvenile Court what actually happened. Again, they suppress material information and make up facts. Defendants Jimenez and Phillips minimize the fact that the County ignored serial glaring red flags, as well as its lack of involvement with and oversight of Grisso. For example, the Detention Report completely leaves out Grisso's refusal to attend training, refusal to allow social workers meet to at her home, refusal to take V.P. to her essential therapy, refusal to cooperate with police in their investigation, and initial refusal to have V.P. participate in the CALICO (forensic) interview. As a result of Defendants' fraudulent non-disclosures, the Juvenile Court continued to order V.P. detained from her parents.

– ***V.P. is Finally Placed With Family on June 26, 2024 But No Services Are Provided to Support V.P. After Her Brutal Rape***

117. V.P. is placed temporarily with her sister, Merly Fernandez on June 26, 2024, but the County fails to provide any adequate support or services for V.P. or her sister. V.P. has none of her clothes or personal belongings from the Grisso home. Defendants didn't even begin Ms. Fernandez's RFA assessment until June 27, 2024.

118. Now all of a sudden the visits with the parents are unsupervised and Defendant Ramos permits overnights between V.P. and her parents without a court order – this could have happened all along. The County had discretion from the beginning to release V.P. to her parents but refrained from doing so.

119. Defendant Ramos and Jimenez did nothing to support V.P. and failed to/refrained from having V.P. promptly assessed medically after her brutal rape. By July 18,

1    2024, V.P. had still not been medically or psychologically assessed and neither of

2    her social workers (Defendants Ramos and Jimenez) knew anything about V.P.'s

3    medical or psychiatric history while she was in County custody.

4   120.   Defendants Jimenez and Phillips suggest to the Court in their Jurisdiction Report

5    dated July 18, 2024 for "Consideration of court action to free child from parental

6    custody and control." These Defendants falsely represent that returning V.P. to her

7    parents would pose a danger to V.P., in part because the parents and her sister, had

8    not enrolled V.P. in school – but it was the middle of summer vacation time. Even

9    so, V.P. had only recently been brutally raped in the Grisso home during the

10    County's supervision and control over her. This was intentionally downplayed in

11    the Report.

12   –   ***Defendant Ramos Takes V.P. to Planned Parenthood Without Parental***

13    ***Notification, Consent, or a Court Order; Ramos Also Impinges Upon Plaintiffs'***

14    ***Educational Decision Making Rights***

15   121.   Defendant Ramos took V.P. to Planned Parenthood for a medical exam on July 22,

16    2024. It is unclear from the records currently in Plaintiffs possession whether she

17    had an abortion. However, prior to doing so, Ramos refrained from notifying her

18    parents, and excluded them from all medical decision making for their daughter

19    regarding the visit and/or abortion. At no time did Ramos apply for a Court order

20    authorizing the visit/examination/abortion, nor did she obtain parental consent.

21   122.   As if she hadn't done enough, Defendant Ramos started interfering with the

22    Plaintiff Parents' educational rights with respect to V.P. For example, without

23    authorization Ramos discussed with V.P. various school options, suggesting that

24    she could do whatever she wanted and that her parents had no right to be involved.

25    At this point in time, pursuant to Court order, Plaintiff Parents held all educational

26    rights with respect to V.P.

27   / / /

28   / / /

– ***Without an Appropriate or Statutorily Compliant Case Plan, V.P.'s Behavior Changes For the Worse; She Begins to Decompensate; Defendants Refrain From Advising The Court***

123.   For months after her rape, the Social Worker Defendants fail to update her case plan to account for her mental health needs. Defendant Jimenez continues to contact Defendant Grisso on a regular basis. Grisso makes arrangements with V.P. to visit her adult "boyfriends."

124.   By July 29, 2024, V.P. spends all of her time on her smart phone, threatens to leave, and wants nothing to do with her family. She continues to act out when she doesn't get what she wants by pulling her hair, lying to everyone, and on one occasion defecating on herself.

125.   This is all reported to Defendant Ramos. But when Ramos submits her reports to the Court, she refrains from disclosing any of it, *i.e.*, Defendants refrain from advising the Court in their official reports that V.P. was still talking to Defendant Grisso, Grisso was making arrangements to take V.P. to meet with her adult "boyfriend," and/or that V.P. was likely being groomed for sex trafficking, if not already being sex trafficked by Grisso.

126.   At the court hearing on August 13, 2024, the Court again granted the County discretion to release V.P. to her parents. But the County refrained from doing so until December 12, 2024.

127.   In the interim, in October 2024, Plaintiffs continued to desperately seek help from the County for what was happening to their daughter. In addition to many other aberrant behaviors, V.P. would go missing for weeks and return with large quantities of drugs. When they complained to the Defendants, the Defendants ignored Plaintiffs.

/ / /

/ / /

1    –    ***Defendants Fail to Promptly Assess And/or Meet V.P.'s Serious***
2    ***Medical/Mental/Behavioral Healthcare Needs; The County Fails to Create a***
3    ***Care Plan to Address V.P.'s Needs***

4    128.    At this point in time, Plaintiffs' parental rights had not been terminated. Indeed,
5    V.P. and her parents were entitled to court ordered reunification services.
6    Moreover, and perhaps more important, from the first moment she was taken into
7    custody up until she was returned to the custody of her parents, V.P. had a right to
8    have her parents involved in her medical and educational decision making and to
9    have them present during medical events, *i.e.*, appointments, evaluations,
10    examinations, treatments, procedures, and the like.

11    129.    Even though V.P. had been taken into custody by the County in February 2024,
12    and it was obvious at that time that she required substantial supervision and
13    mental health/behavioral health services, Defendants Ramos, Mora, Jimenez and
14    Phillips and DOES 11-20, failed to have her promptly assessed and/or to formulate
15    a plan for the ongoing oversight and coordination of V.P.'s necessary and/or
16    essential healthcare services including those related to mental/behavioral health.

17    130.    Even though V.P. and her parents had consistently complained that V.P.'s needs
18    were not being met in her placement, on information and belief, throughout her
19    period of County supervision – including through the present, her substantial
20    medical and mental/behavioral care needs have not been assessed and/or met by
21    those who are responsible for V.P.'s safety and well-being.

22    131.    On information and belief,  no "case plan" as that term is described in 42 U.S.C.
23    §675 was ever created and/or implemented by Alameda County and/or its
24    employees to address V.P.'s serious mental/behavioral and service needs.

25    132.    Indeed, based on records obtained to-date, it is not apparent that the *County*
26    Defendants *ever* created *and* implemented an adequate case plan that complies
27    with 42 U.S.C. Section 675(1) – even to this day.

28    133.    The failure by the County and the individual Defendants to adhere to their duty to

promptly assess V.P. to determine her service needs, and then create and implement an adequate case plan that complies with 42 U.S.C. Section 675(1) to meet those needs, caused and/or contributed substantially to V.P.'s injuries over an extended period of time – and continue even to this day.

## FIRST CLAIM FOR RELIEF

42 U.S.C. §1983 (Unwarranted Seizure of Child)

(By all Plaintiffs against Defendants Walker-Lillard,

Police DOES 1-10, and Supervisor DOES 11-20)

134.    Plaintiffs hereby incorporate by reference all of the above paragraphs of this Complaint as if set forth herein in full.

135.    At all relevant times these Defendants, and each of them, were acting within the course and scope of their duties as government agents/employees and under color of law.

136.    The First, Fourth, and Fourteenth Amendments to the United States Constitution guarantee that children will not be separated from their parents without due process of law except in emergencies. *Mabe v. San Bernardino Cty., Dep't of Pub. Soc. Servs.*, 237 F.3d 1101, 1107-09 (9th Cir. 2001). Officials may not remove children from their parents without a court order unless they have "information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury." *Keates v. Koile*, 883 F.3d 1228 (9th Cir. 2018). These rules are clearly established such that any reasonable government agent faced with the same or similar circumstances would have known that these Defendants' seizure and continued detention of V.P. violated her clearly established rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution. Because unwarranted seizures of children from their parents' custody are addressed under the 14th Amendment to the United States Constitution, V.P.'s parents' (who are also Plaintiffs herein) rights were

1    also violated by the same acts.

2    137.    Defendants Walker-Lillard, Police DOES 1-10, and Supervisor DOES 11-20, and

3    each of them, at all times relevant herein, had an affirmative duty and obligation to

4    recognize, acknowledge, and respect V.P.'s rights, and to conduct themselves in a

5    manner that confirmed, provided for the preservation of, and did not violate the

6    rights guaranteed to her under the United States Constitution, including, without

7    limitation, the right against unwarranted seizure, the protection of familial rights,

8    associational rights, the right to privacy, family integrity, and the right to familial

9    relations.

10    138.    These Defendants, and each of them, at all relevant times herein were acting under

11    color of state law when they jointly acted, or knew and agreed upon and thereby

12    conspired, to violate V.P.'s and her parents' constitutional rights by, but not

13    limited to, removing and detaining V.P. from her family home and the care,

14    custody, and control of her parents, without proper or just cause and/or authority,

15    in the absence of any exigency, and without first obtaining a warrant or other court

16    order. Such conduct violated V.P.'s rights under the First, Fourth, and Fourteenth

17    Amendments to the United States Constitution.

18    139.    As a direct and proximate result of these Defendants' misconduct V.P. and her

19    parents suffered general and special damages according to proof at trial, including

20    but not limited to physical and/or mental anxiety, emotional distress, pain and

21    anguish, among other things.

22    140.    Due to the knowing, wanton, callous, reckless, wrongful and deliberate violation

23    of Plaintiffs' rights as herein alleged and described, Plaintiffs are entitled to

24    recover, and shall seek, punitive damages against these Defendants, and each of

25    them, in accordance with law and subject to proof at trial.

26    / / /

27

28    / / /

COMPLAINT FOR DAMAGES

## SECOND CLAIM FOR RELIEF

### Violation of Constitutional Rights 42 U.S.C. § 1983

### Unwarranted Medical Examinations/Assessments/Procedures

(By Plaintiff V.P. and her Parents Against All Defendants)

141. Plaintiffs hereby incorporate by reference all other paragraphs of this Complaint as if set forth in full.

142. These Defendants, and each of them, were acting under color of law when they jointly acted, agreed, and/or conspired to violate Plaintiffs' constitutional rights by, but not limited to, the performance of unwarranted and non-consensual medical examinations, assessments, and/or procedures on V.P. including forensic and/or investigatory medical assessments, examinations, and/or procedures.

143. At all times relevant hereto, the constitutional right to remain free of non-consensual intrusive medical examinations/assessments and/or procedures was "clearly established" such that any reasonable person in Defendants' circumstances would know that it is a violation of the child's and parents' constitutional rights to subject the child to a medical examinations, assessments, and/or procedures without just cause, parental consent, or a court order/warrant authorizing it. *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000); *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1160-1162 (9th Cir. 2018); *Swartwood v. County of San Diego*, 2014 U.S. Dist. LEXIS 182020, *58-59 (S.D. Cal. Sept. 30, 2014).

144. Children also have a clearly established constitutional right to be accompanied by their parents while they are receiving medical attention or to be in close proximity while all or a part of the medical procedure is being conducted. *Wallis v. Spencer*, 202 F.3d 1126, 1142 (9th Cir. 2000). Parents have an equally clearly established corollary right.

145. On information and belief, these Defendants, and each of them, subjected V.P. to at least one medical/dental examination, assessment, and/or procedure without her

1    parents' knowledge and/or consent, and without the government first having

2    obtained a warrant or other authorizing court order.

3    146.   At the time the foregoing medical and/or dental examinations, assessments, and/or

4    procedures took place, there were no emergent circumstances or any need for

5    urgent medical care that would have obviated constitutional warrant requirements

6    or otherwise justified V.P.'s unwarranted medical and/or dental examinations,

7    assessments, and/or procedures.

8    147.   As a direct and proximate result of these Defendants conduct, V.P.'s  and her

9    parents' rights arising under the First, Fourth and Fourteenth Amendment were

10    violated; and, Plaintiffs have suffered damages thereby, as according to proof at

11    trial.

12    148.   Due to the knowing, wanton, callous, reckless, wrongful and deliberate violation

13    of Plaintiffs' rights as herein alleged and described, Plaintiffs are entitled to

14    recover, and shall seek, punitive damages against these Defendants, and each of

15    them, in accordance with law and subject to proof at trial.

16                              **THIRD CLAIM FOR RELIEF**

17                   **Violation of Constitutional Rights 42 U.S.C. § 1983**

18    **Deception in The Creation of And/or Presentation of Evidence/False Reporting**

19                    (By All Plaintiffs Against Defendants Jimenez, Phillips, Ramos,

20                              and DOES 11 through 20, inclusive)

21    149.   Plaintiffs incorporate the above allegations of fact and law as though fully set

22    forth herein.

23    150.   The right to familial association guaranteed under the Constitution's Fourteenth

24    Amendment is so "clearly established" such that any reasonable government

25    worker and/or child abuse investigator, or other governmental agent, or person

26    acting in an investigatory capacity – including these Defendants, and each of them,

27    would know it is unlawful to continue to detain a child from the care, custody and

28    control of its parents based on knowingly false, and/or based on a juvenile court

order which the particular Defendant fraudulently obtained, or caused to be fraudulently obtained.

151. Plaintiffs are further informed and believe and thereon allege that the right of a parent to remain free of the government's fraudulent creation and/or presentation of false, misleading, and/or deceptive, and/or suppressed material exculpatory evidence in juvenile court proceedings is so clearly established that any government agent or person acting in an investigatory capacity faced with these Defendants' circumstances would know it is a violation of the constitution to either create, or present deceptive evidence against a parent in juvenile court proceedings. *Hardwick v. Cty. of Orange*, (9th Cir. 2017) 844 F.3d 1112, 1118-19; "No official with an IQ greater than room temperature in Alaska could claim that he or she did not know that the conduct at the center of this case violated both state and federal law. The social workers in this case are alleged to have knowingly and maliciously violated the law in their attempt to sever [Plaintiff's] protected relationship with her [daughter]. Perjury is a crime under both federal and California state law, as is the knowing submission of false evidence to a court. 18 U.S.C. § 1621; Cal. Penal Code § 118. Both crimes make no distinction between criminal and civil proceedings. This malicious criminal behavior is hardly conduct for which qualified immunity is either justified or appropriate."

152. At all relevant times alleged herein, these Defendants, and each of them, were acting under color of state law when they acted, agreed, and/or conspired to employ fraudulent tactics to remove and detain, and continue to detain, V.P. from Plaintiffs' custody first by creating false evidence, then later by presenting known materially false, incomplete, and/or misleading evidence to the Juvenile Court *via* their court reports.

153. The actions of these Defendants, and each of them, as alleged herein above were undertaken with a knowing and deliberate indifference to Plaintiffs' clearly established rights, and/or with the specific intention of harming them both

1    personally and in their respective parent/child relationships.

2    154.    These Defendants, and each of them, maliciously conspired to violate Plaintiffs'

3    constitutional rights including their rights arising under the First and Fourteenth

4    Amendments to the United States Constitution – and did violate their rights by,

5    but not limited to: The creation and propagation of false information in

6    Defendants' court reports as alleged herein above – knowing and intending that

7    they would be presented to the Juvenile Court, accepted into evidence, and relied

8    upon by the Juvenile Court in making its decisions.

9    155.    The aforementioned misrepresentations and omissions, and others, were material

10    to the outcome of the Detention Hearing, and later the Jurisdictional Hearing, in

11    that, as alleged herein above, the Juvenile Court accepted them into evidence and

12    relied upon them in making each and every one of its findings and orders.

13    156.    The aforementioned conduct by these Defendants, and each of them, was

14    malicious and had the effect of denying Plaintiffs their right to a fair hearing, as

15    well as, their respective rights to continued parental custody of V.P., for an

16    unnecessary and excessive period of time.

17    157.    By spreading lies, maliciously refusing to provide exculpatory evidence, and

18    presenting fabricated and misleading evidence to the Juvenile Court during the

19    dependency proceedings these Defendants, and each of them, knowingly and

20    intentionally violated Plaintiffs' rights arising under the First and Fourteenth

21    Amendments to the United States Constitution.

22    158.    As a direct and proximate result of these Defendants' actions Plaintiffs have

23    suffered and will continue to suffer economic injury, mental and emotional injury,

24    as well as physical manifestations of such mental and emotional suffering, all to an

25    extent, degree, and amount subject to proof at trial.

26    159.    Plaintiffs are informed and believe and thereon allege that Defendants, and each of

27    them, acted with malice, oppression and fraud or otherwise acted with a willful,

28    wanton, knowing, and conscious disregard for Plaintiffs' rights in a despicable,

COMPLAINT FOR DAMAGES

vile and contemptible manner. Therefore, Plaintiffs are entitled to an award of punitive damages for the purpose of punishing these Defendants, and each of them, in order to deter them, and others similarly situated, from similar such misconduct in the future.

## FOURTH CLAIM FOR RELIEF

### Violation of Constitutional Rights 42 U.S.C. 1983

### Failure to Provide Dependent Minor Continued Safety and Security

### and Even Minimally-Adequate Care and Supervision

(By Plaintiff V.P. Against All Defendants)

160. Plaintiff V.P.  hereby refers to, incorporates by reference all other paragraphs of this Complaint as if set forth in full.

161. At all relevant times alleged herein, Defendants, and each of them, were acting within the course and scope of their duties as Alameda County employees and/or agents and under color of law.

162. Once the state assumes wardship of a child, the state owes the child, as part of that person's protected liberty interest, reasonable safety and adequate care and supervision. *Lipscomb by and through DeFehr v. Simmons*, 962 F.2d 1374, 1379 (9th Cir. 1992). The Constitution's Fourteenth Amendment protects a foster child's interest in social worker supervision and protection. *Tamas v. Dep't of Soc. & Health Servs*., 630 F.3d 833, 842-843 (9th Cir. 2010). Thus, once the government assumes custody and care of a child, it owes that child a duty to provide reasonable safety and security, and at least minimally-adequate care and supervision, including protection from sexual assault while the child is in custody.

163. V.P. was a dependent child under the care, custody, and control of Alameda County as soon the Detention Hearing concluded, on or about February 5, 2024. *See, e.g*., *Gerrie v. Cty. of San Bernardino*, No. EDCV 19-1435 (JGB) (SPx), 2019 U.S. Dist. LEXIS 228051 (C.D. Cal. Nov. 12, 2019); *see also*, *Garcia v. Cty. of San Diego*, No. 15-CV-189 JLS (NLS), 2018 U.S. Dist. LEXIS 101718, at *36

(S.D. Cal. June 18, 2018). By virtue of her status as a ward of the County, V.P. held protected liberty interests in being shielded from harm inflicted in foster care and enjoyed a special relationship with the County and each of the remaining Defendants, including DOES 11-20 and each of them, who were charged with the duty to provide, or to participate in providing for her continued safety, care, and supervision.

164.  At all relevant times, V.P. held protected liberty interests in being shielded from harm inflicted in foster care and enjoyed a special relationship with the County – once the County assumed her custody and care.

165.  At all times applicable herein, said liberty interest and duties of Defendants, and each of them, was so clearly established that any reasonable person similarly-situated would know it was a violation of V.P.'s fundamental rights to fail to provide for her continued safety and security and to fail to provide her with at least minimally-adequate care and supervision, including reasonably adequate protection from sexual abuse and molestation in her various County controlled placements.

166.  Moreover, these Defendants, and each of them, are liable where (as here) their actions create or expose an individual to a danger which he or she would not have otherwise faced. *Henry A. v. Willden,* 678 F.3d 991, 1002 (9th Cir. 2012); *Martinez v. City of Clovis*, 943 F.3d 1260 (9th Cir. 2019). Through these Defendants' actions and/or inactions, V.P. was placed in greater danger than she otherwise would have faced if left with her parents, or if promptly returned to their care.

167.  These Defendants, and each of them, knew, or with the exercise of reasonable care should have known, that the Grisso placement was and/or would be a dangerous and inappropriate placement for V.P. given her unstable behavioral health issues, AWOL tendencies, and drug history. Also, given V.P.'s clear indicators of CSEC tendencies, she was in a known and particularly vulnerable state at the time these

Defendants decided to place her in the Grisso home. In spite of this, these Defendants, and each of them: (1) failed to reasonably and/or adequately assess the Grisso placement, (2) ignored Grisso's prior drug and criminal history, (3) allowed V.P. to be placed in Grisso's control and "care," (4) allowed V.P. to remain virtually unmonitored in Grisso's home and care for a prolonged period of time, (5) continued to allow Grisso to have access to and control of V.P. for a prolonged period of time, and/or (6) ignored multiple red flags indicating that V.P.'s placement with Grisso put V.P. in danger of chronic abuse and/or neglect.

168. On information and belief, these Defendants, and each of them, knew, or with the exercise of reasonable care should have known, that Grisso was an inappropriate and even dangerous placement for V.P. On further information and belief, despite their, knowledge, these Defendants, and each of them: (1) failed to reasonably and/or adequately disclose the details regarding Grisso's known deficiencies, (2) ignored the Parent Plaintiffs' stated safety concerns with respect to Grisso, (3) allowed V.P. to remain in Grisso's "care," (4) allowed Grisso continuous access to V.P., (5) approved and/or participated in the approval of V.P.'s placement with Grisso without considering her criminal history and/or the fact that she had a history of cavorting with known gang members and drug dealers, (6) knew or had reason to know that Grisso's lack of good judgment would affect her ability to reasonably supervise and care for V.P., and, (7) failed to conduct an adequate background check on Grisso and the adults that would stay in the home prior to V.P.'s placement there. This conduct paved the way for V.P. to be inserted into a known dangerous environment where she was brutally raped.

169. On information and belief, in spite of their knowledge and understanding of V.P.'s clearly established rights arising under the 14th Amendment to the United States Constitution, and their knowledge of the dangers posed to V.P.'s by Grisso, the Defendants, and each of them were deliberately indifferent to both V.P.'s rights and to the danger she would be in when they decided to place her under Grisso's

1    control.

2    170. V.P. would not have faced any danger at all had she not been placed in Grisso's

3    home, and but for being placed there with minimal agency supervision, V.P. would

4    not have been brutally raped by one of Grisso's gang member/drug dealer

5    associates.

6    171. As a direct and proximate result of these Defendants' acts and omissions, V.P.

7    suffered injuries as alleged herein, including but not limited to injuries to her

8    person, which injuries include sexual abuse, pain, humiliation, anxiety, mental

9    anguish, emotional distress and other general and special damages in an amount to

10   be ascertained according to proof at trial.

11   172. Due to the Defendants' reckless and knowing violation of V.P.'s rights and/or

12   their wanton disregard of her rights, and the wrongful and despicable nature of the

13   Defendants' misconduct, as herein alleged and described above, Plaintiff is

14   entitled to recover punitive damages against the individual Defendants, and each

15   of them, in accordance with law and subject to proof at trial.

16                          **FIFTH CLAIM FOR RELIEF**

17             **Violation of Constitutional Rights 42 U.S.C. 1983**

18                       **Violation of Federal Statute**

19   (By Plaintiff V.P. Against Alameda County, and All Social Worker Defendants, and

20                        DOES 11-20, inclusive)

21   173. Plaintiff V.P.  hereby refers to, incorporates by reference, and realleges all other

22   paragraphs of this Complaint as if set forth in full.

23   174. Defendant Alameda County has received millions of dollars in federal funds to

24   meet the needs of children in its child welfare system and is therefore required to

25   comply with federal mandates attached to those funds, including those set forth in

26   the Adoption Assistance and Child Welfare Act of 1980, as amended by the

27   Adoption and Safe Families Act of 1997; Titles IV-B and IV-E of the Social

28   Security Act; 42 U.S.C. §§ 622, et seq.; 671, et seq.

175. The Adoption Act expressly applies to both state and municipal agencies. 42 U.S.C. §671(a)(3)-(a)(4). The Adoption Act is required to be in effect and coordinated at both the state and local levels. *Ibid*. Indeed, the Act expressly states that local public child welfare agencies take on responsibility for furnishing the child welfare services when they receive federal funds. 42 U.S.C. §622(b)(1); 42 U.S.C. §626(a)(1)(B).

176. The Adoption Act makes no distinction between the "state" and "local agencies." 42 U.S.C. §671(a)(3); 42 U.S.C. §622(b)(1). The statutory language uses the word "state" as a default, but specifically notes that local public agencies are required to be in compliance with the Adoption Act as well. *Ibid*. Where the child welfare services are furnished by the staff of a local agency, that agency retains the same duties. 42 U.S.C. §622(b)(1)(B). These required duties include providing reports (42 U.S.C. §622(b)(6)), providing health care plans (42 U.S.C. §622(b)(15)), and monthly visits with case planning and service delivery. 42 U.S.C. §622(b)(17). The Adoption Act also informs local agencies they can be subjected to penalties for failing to comply with provisions of the Adoption Act. 42 U.S.C. §674(d).

177. The mandates arising under 42 USC §671 and § 675, including but not limited to the case plan provisions are enforceable through 42 U.S.C. §1983. *Henry A. v. Willden*, 678 F.3d 991, 1006 (9th Cir. 2012). This includes a description of the type of home or institution in which a child is to be placed, including "a discussion of the safety and appropriateness of the placement," among other things. 42 U.S.C. §675(1)(A).

178. Defendant County, and its employee Defendants, were required to promptly develop and implement a Case Plan (as defined by 42 U.S.C. § 675(1)) for V.P. that was adequate to meet her particularized service needs and requirements.

179. At all relevant times, these Defendants, and each of them, were employed in one capacity or another by Alameda County, and were required under 42 U.S.C. §671(a)(16) and California law to promptly develop a case plan (as defined by

675(1)), in accordance with the requirements described in 42 U.S.C. §675a, for V.P. while she remained in the County's care, custody, and control. This plan was required to include a plan for ensuring "[t]hat the child receives safe and proper care and that services are provided to the . . . child . . . in order to. . . address the needs of the child while in foster care, including a discussion of the appropriateness of the services that have been provided to the child under the plan." 42 U.S.C. §675(B).

180. At each stage in the underlying juvenile dependency case the individual County Defendants knew definitively that V.P. required a higher level of care to deal with her known issues and self destructive and/or dangerous behaviors. In spite of their obligations under 42 U.S.C.§§ 671(a)(16) and 675(1) to promptly craft a case plan that was adequate to address V.P.'s specific needs while in foster care, Defendants knowingly and deliberately refrained from doing so.

181. On information and belief, these Defendants, and each of them, failed at each stage of V.P.'s juvenile dependency case to promptly assess her and/or develop a case plan and/or offer services designed to ameliorate or otherwise address her easily identifiable issues and problems. Instead, Defendants essentially ignored their obligation to take the aforementioned steps, *i.e.*, assess V.P.'s needs and promptly develop an adequate case plan to address those needs, promptly create, implement, and enforce a case plan that addressed V.P.'s known needs, *i.e.*, that included essential services appropriate for her particularized circumstances and needs, and/or to ensure that V.P. received even minimally adequate care, safety, supervision, and services while under the County's custody, care, and supervision.

182. On information and belief, V.P.'s various social workers did not *ever* visit her in the Grisso home, nor did they ever visit Grisso in her home, let alone on a monthly basis. Nor on a routine basis did any of the Defendants communicate with treating medical professionals to ensure that V.P.'s mental and/or behavioral health care needs were being met. There was *no plan* that met the requirements of the federal

1    statutory scheme to ensure V.P.'s safety, permanency and well-being or

2    supervision.

3    183.  As a direct and proximate result of the acts and omissions of Defendants, and each

4    of them, as detailed above, V.P. suffered damages, and continues to suffer

5    damages, in an amount according to proof at trial.

6    184.  The acts and omissions of Defendants, and each of them, as herein alleged were

7    intentional and/or done with a conscious disregard for V.P.'s rights. Because

8    Defendants acted with a wanton and reckless disregard of V.P.'s obvious and

9    known rights, Plaintiff is entitled to recover punitive damages against the

10   individual defendants as according to proof at trial.

11                            **SIXTH CLAIM FOR RELIEF**

12                          **For Breach of Mandatory Duties**

13   (By Plaintiff V.P.  Against Alameda County (Vicarious Liability), each of its Social

14                          Worker Defendants, and DOES 11 through 20)

15   185.  Plaintiff V.P. hereby refers to, incorporates by reference, and realleges all other

16   paragraphs of this Complaint as if set forth in full.

17   186.  Plaintiff alleges on information and belief that Defendants, and each of them,

18   continuously violated mandatory duties including, but not limited to, those set

19   forth in regulations in the California Department of Social Services (CDSS)

20   Manual of Policies and Procedures (MPP) established pursuant to Welfare &

21   Institutions Code §16501 and as set forth in Alameda County's Department of

22   Children and Family Services Handbook and Penal code section 11164-11166.

23   187.  Defendants violated Cal. Penal Code, §11165.91, 11166, Cal. Welf. & Inst. Code

24   §16504(a), 16501(d), and/or 16501(f), and Regulations 31-101, 31-105, 31-125

25   and 31-501 by failing to accept reports and themselves failing to report known

26   and/or suspected child abuse and/or neglect of V.P. without legal justification and

27   did not properly investigate or maintain a record of all reports received.

28   188.  Defendant violated Regulation 31-137 by failing to ensure V.P.'s medical needs

were met. Pursuant to Division 31 regulations, 31-137, at the time of her removal Defendants were required to "[p]rovide or ensure the provision of adequate care and supervision to [V.P.] which shall include the following:"

> .211 Adequate food; .212 Supervision by an adequate number of staff trained to address the needs and ensure the safety and wellbeing of children in crisis; .213 Age-appropriate activities; .214 Ensuring the child's medical needs are met; .215 Protecting the personal rights of children as appropriate and consistent with Welfare and Institutions Code Section 16001.9, considering the transitional care setting.[16]

189.    Defendants violated Regulations 31-201 through 206 by failing to complete an assessment of V.P.'s needs, document the same, complete an appropriate case plan with goals and measurable objectives to address V.P.'s needs within a reasonable time, and failing to implement a case plan that met statutory requirements in a prompt and timely manner.

190.    Defendants violated Regulation 31-206.31and Cal. Welf. & Inst. Code 16501.1 by failing to complete an assessment of and document in the case plan V.P.'s placement needs when they placed her with Grisso.

191.    Defendants violated Regulations 31-210 and 31-215 by failing to comply with the case plan time frames and administrative requirements within 30 calendar days of V.P.'s removal.

192.    Defendants violated Regulations 31-225, 31-230 and 31-235 by failing to change V.P.'s case plan with specific and accurate information about her current condition, lack of care, and the case plans adequacy and continued appropriateness for V.P.'s needs when they knew that Grisso's home was and inadequate and inappropriate placement for V.P.'s needs.

193.    Defendants violated Regulations 31-310 and 31-405.22 by failing to monitor

---

[16]Cal. Welf. Inst. Code §16001.9(a) provides, among other rights to dependent children, the right to live in a safe, healthy, and comfortable home where they are treated with respect; to be free from physical, emotional, or other abuse; to be placed with a relative or non-relative extended family member if an appropriate and willing individual is available; and, to access and receive medical, dental, vision, mental health health care, with reasonable promptness that meets the needs of the child.

V.P.'s needs, care and supervision as well as her mental/behavioral/emotional condition, by failing to provide services appropriate to meet those needs, failing to take necessary actions to safeguard V.P.'s growth and development while in foster care placement.

194. Defendants violated Regulation 31-335 by not complying with the social worker contact requirements with V.P.'s service providers in failing to obtain, document and monitor V.P.'s health and safety.

195. Defendants violated Regulation 31-405.11 when they failed to consider V.P.'s relatives as a potential placement for V.P.'s after her removal and before placing her with Grisso.

196. Defendants violated CDSS MPP Regulations 31-410.7-.76, by failing to consider the ease of accessibility for visitation and the appropriateness of the placement when placing V.P. in an out-of-county foster care.

197. Defendants violated Regulations 31-420.11, 31-420.211 and Cal. Welf. & Inst. Code, §361.3 by failing to give preferential placement consideration to V.P.'s relatives.

198. In addition to the foregoing, Defendants violated the following regulations:

    a.   Cal. Penal Code, §11164, et seq., §11165.9, §11166, by failing to report known and/or suspected neglect and/or abuse of Plaintiff to appropriate authorities and failed to make initial reports or follow up reports within 36 hours of receiving said reports of abuse and/or neglect.

    b.   CDSS MPP Regulations 31-201, 31-205, 31-206 and/or Cal. Welf. & Inst. Code, §16501.1(d), by failing to conduct an assessment and develop a case plan.

    c.   CDSS MPP Regulations 31-101, 31-105, 31-110, 31-115, 31-120, and/or 31-128 and/or Cal. Welf. & Inst. Code, §16504, by failing to conduct a basic evaluation of risks to determine whether an emergency situation existed.

d.   Cal. Welf. & Inst. Code, §16504(a), 16501(d), and/or 16501(f), by failing to control the conduct of Ms. Grisso and/or other perpetrators, and/or otherwise protect Plaintiff.

e.   Cal. Welf. & Inst. Code §366.

f.   Cal Health & Saf. Code §1520.

g.   Cal. DSS, Regulations 31-075; 31-101; 31-105; 31-125; 31-205; 31-206; 31-300, 31-310; 31-320; 31-330; 31-400, and 31-405.

h.   22 CCR §§35079-35091; 35123; 35180-35184; 35197; 35203; 35207-35207.1; 35211.

i.   22 CCR §§89227; 89231; 89318; 89372.

199.   Alameda County, the named Individual County Employees and DOES 11-20, breached their mandatory duties, as set forth above in that Defendants, and each of them, were required to meet certain pre-placement evaluation and approval duties, as well as, providing adequate services to allow Plaintiffs to reunify with V.P. and avoiding unfairly obstructing Plaintiffs' ability to pursue those services and refrained from doing so.

200.   Plaintiff alleges that Defendants, and each of them, continuously breached their mandatory duties as set forth in the preceding paragraphs, during the entire time V.P. was in the County's custody through the present.

201.   As a proximate result of Defendants' failure to fulfill their mandatory duties, V.P. suffered neglect, abuse and/or mistreatment beginning on the date she was first placed in the Grisso home through the present, all of which ultimately caused or contributed to V.P. suffering abuse and neglect over a prolonged period of time, including the her brutal rape.  Plaintiff also suffered special and general damages as a result of the continuous acts and omissions of Defendants which ultimately caused or substantially contributed to her injuries.

202.   As a direct result of the acts and omissions of Defendants, Plaintiff sustained general and special damages in amounts within the jurisdictional limits of this

1    court according to proof at trial.

2    **SEVENTH CLAIM FOR RELIEF**

3    **Negligence/Breach of Duties Imposed Under Special Relationship**

4    (By Plaintiff V.P. Against All County Affiliated Defendants

5    Including Alameda County (Vicarious Liability).)

6    203.  Plaintiff V.P. hereby refers to, incorporates by reference, and realleges all other

7          paragraphs of this Complaint as if set forth in full.

8    204.  Tort liability for governmental entities is based upon statute. *Guerrero v. South*

9          *Bay Union School Dist.*, *supra*, 114 Cal.App.4th at p. 268. Government tort

10         liability is imposed against governmental entities where there is vicarious liability

11         for employees and independent contractors for acts and omissions within the scope

12         of their employment (Gov. Code, §§ 815.2, 815.4); and for failures to discharge

13         mandatory statutory duties (Gov. Code, § 815.6). (5 Witkin, Summary of Cal. Law

14         (9th ed. 1990) Torts, § 224.) By contrast, a public employee is liable for common

15         law torts to the same extent as a private person. (Gov. Code, § 820.)

16   205.  At all relevant times, Plaintiff was a dependent minor under the care and custody

17         of Alameda County, *i.e.*, she was under the custody, supervision, care and control

18         of Alameda County for the purpose of providing care, supervision and control of

19         her health, welfare, safety, and supervision.

20   206.  A special relationship was thus established between each of the Defendants and

21         V.P. under which Alameda County CFS, the Social Worker Defendants, and/or

22         DOES 11-20, and each of them, owed a legal duty of care to Plaintiff, and to

23         protect her from foreseeable harm.

24   207.  Despite the existence of the aforementioned special relationships, the individual

25         Defendants, including DOES 11 through 20, and each of them, breached the duties

26         of due care owed to V.P. under said special relationships while acting within the

27         scope of their agency or employment with Defendant County of Alameda, by

28         failing and neglecting to fulfill or perform their respective duties to control,

1    monitor, care for, supervise and protect Plaintiff's health, security, safety and

2    well-being while she remained under their respective care and supervision/control.

3    208.   The acts and omissions of these Defendants, and each of them, as set out in detail

4    above, was a substantial factor in causing V.P. substantial harm, i.e., she was

5    brutally raped.

6    209.   As noted *supra*, California Government Code, §820 provides that an employee of

7    a public entity is liable for his or her acts or omissions to the same extent as a

8    private person, and under California Government Code, §815.2 the public entity

9    that employs the individual is vicariously liable for the torts of its employees

10   committed in the scope of employment. As such, to the extent the individual

11   Defendants are liable as alleged above, Defendant Alameda County is vicariously

12   liable in that all of the aforementioned acts and omissions were undertake in the

13   course and scope of the individual Defendants' agency and/or employment.

14   210.   As a direct and proximate result of Defendants' breach of their respective duties to

15   V.P., she sustained serious physical injuries, to an extent and in an amount subject

16   to proof at trial. V.P. also sustained psychological, mental, and/or emotional

17   injuries, to an extent and in an amount subject to proof at trial.

18   211.   Defendants acts and/or omissions were the proximate, legal causes of the damages

19   sustained by Plaintiff, and they have incurred damages to be shown by proof at

20   trial.

21   / / /

22

23   / / /

24

25   / / /

26

27   / / /

28

1

## Jury Trial Demand

2  212.   Plaintiffs demand a jury trial on each Claim for Relief set forth above.

3

## Prayer for Relief

4        WHEREFORE, Plaintiffs pray for judgment against Defendants, as to all causes of

5  action, as follows:

6        1.    General damages and special damages according to proof;

7        2.    As against the individual defendants, punitive damages as allowed by law;

8        3.    Attorneys fees, as allowed by law;

9        4.    Pre-judgment interest against all Defendants;

10       5.    Costs of suit incurred herein; and

11       6.    Such further relief as the Court deems just and proper.

12  Dated: January 23, 2026          THE LAW OFFICES OF SHAWN A. MCMILLAN, APC

13

14                                   /s/ Shawn A. McMillan
                                     Shawn A. McMillan, Esq.
15                                   Tiffany Chung, Esq.

16                                   Attorneys for Plaintiff V.P., a minor, by and through her
                                     guardian ad litem, CARLOTA GARCIA-PACHUCA
17

18

19

20

21

22

23

24

25

26

27

28